UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| SARAH LEE, | Case No. 3:15-cv-0165-AC |
|     Plaintiff, | FINDINGS OF FACT AND |
|     v. | CONCLUSIONS OF LAW |
| TREES, INC., a Delaware corporation, and PAUL SIMS, an individual, | |
|     Defendants. | |
| PAUL SIMS, | |
|     Counter Claimant, | |
|     v. | |
| SARAH LEE, | |
|     Counter Defendant. | |

ACOSTA, Magistrate Judge:

This lawsuit arises from plaintiff Sarah Lee's ("Lee") allegations of employment discrimination and sexual harassment against defendants Trees, Inc. ("Trees"), and Paul Sims ("Sims") (collectively, "Defendants"). Sims asserts that he and Lee entered into a binding settlement

agreement resolving Lee's claims against Sims and Sims's counterclaims against Lee. Based on the purported settlement agreement, Sims filed alternative motions for summary judgment or for enforcement of the settlement agreement. (ECF No. 65.) Lee contends no enforceable settlement agreement exists. (ECF No. 70.)

The court has the equitable power to enforce a settlement agreement in any dispute before the court. *Callie v. Near*, 829 F.2d 888, 890 (1987). Where the existence or terms of a settlement agreement are in dispute, the court must allow the parties an evidentiary hearing to resolve disputes of material fact regarding an agreement to settle the case. *Id.* Based on the factual dispute, the court held an evidentiary hearing to determine whether Lee and Sims entered into a settlement agreement and, if so, upon which terms. (*See* Tr. of Evid. Hr'g (ECF No. 88).) The court heard testimony from attorneys Courtney Angeli ("Angeli"), Kristine Lambert ("Lambert"), and Eric Fjelstad ("Fjelstad").[1] Trees did not participate in the evidentiary hearing. Following the evidentiary hearing, Lee and Sims submitted to the court their respective proposed Findings of Fact and Conclusions of Law. Upon review of the pleadings, sworn testimony of witnesses, and other evidence introduced at the evidentiary hearing by the parties, the court makes the following Findings of Fact and Conclusions of Law regarding whether an enforceable settlement agreement exists between Lee and Sims.

/ / / / /

/ / / / /

---

[1] Sims moved for a declaration of partial waiver of the attorney-client privilege between Fjelstad and Lee as to what settlement authority Lee gave to Fjelstad. (ECF No. 84.) The court granted the motion at the evidentiary hearing. (Tr. 7:2–11; 9:13–10:14.) Lee waived attorney-client privilege from January 2016 until March 2016, as to communications regarding the extent of settlement authority by arguing that she did not give Fjelstad authority to settle with Sims as an individual. *Id.*

*Findings of Fact*

I.  Parties and Counsel.

1.  Lee filed a complaint against defendants Trees and Paul Sims alleging sexual harassment, sex discrimination, assault, battery and intentional infliction of emotional distress.  (ECF No. 1.)

2.  Trees and Sims each answered the complaint.  (ECF Nos. 6, 8, 37.)  Sims also asserted four additional counterclaims against Lee seeking money damages for intentional infliction of emotional distress, wrongful conversion of personal property, defamation, and intentional interference with a business relationship.  (ECF Nos. 8, 37.)

3.  Lee was represented by attorney Eric Fjelstad ("Fjelstad") when this lawsuit began.  (ECF No. 1.)  Fjelstad withdrew from his representation of Lee on April 21, 2016.  (ECF No. 34.)  Lee is now represented by attorneys Edwin A. Harnden and Tyler J. Volm.  (ECF No. 54.)

4.  Trees is represented by attorney Louis Santiago ("Santiago").  (ECF No. 6.)

5.  Sims is represented by attorneys Courtney Angeli ("Angeli") and Kristine Lambert ("Lambert").  (ECF No. 8.)

II.  January 2016 Conference.

6.  In January 2016, Fjelstad, Santiago, Angeli, and Lambert met to discuss the status of this lawsuit.  Sims and Lee did not attend this meeting, nor did a representative of Trees.  (Tr. 13:2–17; 34:4–11; 47:17–48:10.)

7.  Before the January 2016 meeting, Fjelstad discussed the upcoming meeting with Lee.  Fjelstad told Lee he expected settlement might be a topic of the meeting.  Lee and Fjelstad did not discuss what Fjelstad should do if Sims or Trees made a settlement offer.  Fjelstad did not have any authorization from Lee to settle the case. (Tr. 51:9–15; 51:16–52:7.)

8. Angeli told Fjelstad about a recent expert report regarding Lee's mobile phone. Angeli believed the report called into question the veracity of Lee's allegations. (Tr. 13:2–10.)

9. At the end of the meeting, Angeli suggested a walkaway settlement, where Lee and Sims would dismiss their claims against each other. Santiago nonverbally indicated he thought Trees would be willing to walk away, although Trees did not have any counterclaims against Lee to dismiss. (Tr. 13:21–14:9; 38:23–39:10.)

10. Fjelstad thought about the case holistically, such that any resolution would dispose of all claims and parties. He did not express his approach to Angeli, Lambert, or Santiago. During the meeting, Fjelstad assumed, but did not tell Angeli, Lambert, and Santiago, that Lee required a global settlement. (Tr. 44:20–45:3; 52:8–12; 53:13–16.)

11. Fjelstad stated he would speak with Lee about how she wanted to proceed. (Tr. 14:15–17.)

III. Fjelstad and Lee discuss settlement.

12. After the January meeting, Fjelstad called Lee to discuss the information learned at the meeting and the prospect for a walkaway settlement. Fjelstad informed Lee that contesting the expert report would be expensive, and recommended settling the case. Lee requested more time to make a decision. (Tr. 53:21–55:5.)

13. Fjelstad and Lee consistently discussed settling the case with both defendants. Fjelstand and Lee never discussed the possibility of an individual settlement. (Tr. 53:13–16; 55:1–5.)

14. Lee and Fjelstad spoke on the phone 2–4 more times after their first post-meeting phone call. (Tr. 55:20–22; 57:1–18.)

15. Lee eventually gave Fjelstad authority to agree to a walkaway settlement with "them" — both Trees and Sims. (Tr. 55:20–24.)

IV.  Fjelstad proposes settlement.

16.  On March 4, 2016, Fjelstad left a voicemail message for Angeli regarding settlement.  The message stated, in part: "I would like to talk to you about Sarah Lee and see if we can end this thing."  Fjelstad asked Angeli to call him back.  (Ex. 1; Tr. 14:20–16:16.)

17.  At an unspecified time before March 4, 2016, Sims gave Angeli authority to settle the claims between him and Lee on a walkaway basis.  (Tr. 18:8–11.)

18.  Shortly after receiving Fjelstad's message, Angeli called Fjelstad.  Fjelstad asked whether Sims was still amenable to the walkaway settlement discussed at the January meeting.  Angeli responded that Sims remained willing to settle the case on a walkaway basis.  Fjelstad then stated Lee wanted to do so.  Angeli accepted Fjelstad's offer of a walkaway settlement.  She then offered to prepare dismissal papers to file with the court.  (Tr. 16:24–17:15; 39:17–22.)

19.  Before ending the call, Fjelstad asked whether Santiago and Trees would be willing to settle on the same terms.  Angeli replied that she thought Trees would agree to the same terms, but did not represent Trees.  (Tr. 17:16–20; 45:4–7.)

V.  Attempts to reach a written settlement agreement.

20.  Sims filed a motion to compel discovery in January 2016, after the meeting.  (ECF no. 23.)  Lee's response to this motion was overdue by March 4.  On March 7, Fjelstad notified the court that the matter had been settled, to eliminate the need for a response.  (ECF No. 27.)  The court entered a scheduling order noting that Fjelstad had notified the court that the matter was settled, and set a date for a final paper call.  (ECF No. 27.)

21.  On March 8, 2016, Santiago contacted Fjelstad via email to express his confusion regarding the court's scheduling order, as Trees had not yet responded to Lee's offer of a walkaway settlement.

Fjelstad responded that he understood that, based on Angeli's representation, Trees would accept a walkaway settlement. Fjelstad then offered to settle Lee's claims against Trees on a walkaway basis. (Ex. 3 at 3–4.)

22. Replying to Fjelstad's email, Santiago rejected a walkaway settlement as unduly vague. He stated he would send a written settlement agreement for Lee to consider. (Ex. 3 at 2.)

23. Santiago sent a written settlement agreement to Fjelstad with terms in addition to the provision that all parties dismiss their claims. One of the additional terms was a "no-rehire" clause precluding Lee from future employment with Trees. (Ex. 3 at 6–7.)

24. On March 22, Fjelstad sent Santiago an email stating Fjelstad's approval of the written agreement. Fjelstad stated he would send the agreement to Lee for her signature. (Ex. 2 at 1.)

25. Fjelstad knew from previous conversations with Lee that she was likely to oppose the no-rehire clause in the proposed written agreement. He believed that he would be able to convince Lee to accept the no-rehire clause, however. (Tr. 44:12–15.)

26. Fjelstad sent Lee the proposed settlement agreement via conventional mail because Lee did not have access to a computer at the time. (Tr. 42:22–43:9.)

27. Upon receiving the proposed settlement agreement, Lee contacted Fjelstad. She rejected the proposed agreement because of the no-rehire provision and a provision regarding non-party Joint Apprenticeship Training Committee ("JATC"). (Tr. 43:11–13.)

28. Fjelstad and Santiago were unable to reach a mutually acceptable settlement agreement. Lambert and Angeli learned of Lee's rejection of the Santiago-drafted settlement agreement on April 6, 2016. (Tr. 26:10–19; 29:23–25; 43:11–13.)

29. Lambert called Fjelstad on April 8. When she called Fjelstad, Lambert believed Lee and Sims

had a binding oral settlement agreement based on the March 4 oral agreement between Angeli and Fjelstad. The purpose of Lambert's phone call was to finalize the walkaway settlement agreement between Lee and Sims. On April 8, Fjelstad did not answer. (Tr. 30:2–9.)

30. Lambert called Fjelstad again on April 12.[2] This time, Fjelstad answered. Lambert asked whether Lee remained willing to enter into an individual walkaway settlement agreement with Sims. Fjelstad stated that Lee remained interested in settling with Sims, and that she had rejected the proposed written agreement only because of the no-rehire provision and JATC release — provisions which had nothing to do with Sims. Fjelstad reiterated his acceptance of a mutual walkway settlement on Lee's behalf. Lambert offered to draft a standard short-form settlement agreement, and Fjelstad agreed that she could do so. (Tr. 30:11–24; 31:21–32:1.)

31. Lambert prepared a settlement agreement using the shortest form she could find. That form contained a mutual non-disparagement term. Neither Angeli nor Lambert ever discussed this term with Fjelstad. Lambert included the non-disparagement provision because it was a part of the shortest form settlement agreement she could find. Had Lee requested its removal, Lambert would have removed the non-disparagement provision. (Ex. 4; Tr. 35:4–36:5.)

32. Lambert faxed the form settlement agreement to Fjelstad. Later, Lambert's paralegal called Fjelstad to ensure he had received the agreement. Fjelstad asked to speak with Lambert. Fjelstad then told Lambert that Lee was no longer willing to settle with Sims. (Tr. 30:25–32:11.)

33. Lambert told Fjelstad that she and Angeli would take the position that Lee and Sims had an enforceable settlement agreement. Fjelstad informed Lambert that he intended to withdraw as

---

[2] At the evidentiary hearing, Lambert testified at length regarding the April 12 conversation. Fjelstad testified that he did not specifically recall the conversation, but had no reason to doubt Lambert's account of their conversation. (Tr. 59:5–14.)

counsel for Lee. (Tr. 32:12–17.)

34. During a telephone status conference with the court on April 13, Fjelstad informed the court that he intended to withdraw from his representation of Lee. (ECF No. 33.) Fjelstad filed his notice of withdrawal on April 21. (ECF No. 34.)

*Conclusions of Law*

1. Whether an enforceable settlement agreement exists is an issue of contract formation. *O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir. 2004) (citing *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir.1992)). Because the settlement negotiations occurred in Oregon, Oregon law governs whether an enforceable settlement agreement exists. *Id.*

2. Whether the parties formed a valid contract is a question of law in Oregon. *Dalton v. Robert Jahn Corp.*, 209 Or. App. 120, 132 (2006); *see also Dumitrash v. Recontrust Co., NA*, No. 3:11-cv-1062-BR, 2013 WL 3973811, at *4 (D. Or. July 31, 2013). A valid contract exists when there is "a meeting of the minds as to all of its terms [and] nothing [is] left for future negotiations." *Philips v. Johnson*, 266 Or. 544, 555 (1973). Sims, as the proponent of the contract, bears the burden of proving its existence and terms. *Holdner v. Holdner*, 176 Or. App. 111, 120 (2001).

3. Oregon law determines the existence of a contract and the terms of a contract from "the parties' objective manifestations of intent, as evidenced by their communications and acts." *Dalton*, 209 Or. App. at 132 (citation omitted). A party's "uncommunicated subjective understanding" does not override objective indications of agreement. *Id.* (citation omitted).

4. Oral assent to a settlement agreement has binding effect if the parties "objectively manifested an intent to be bound before the written settlement agreement was prepared." *Hughes v. Misar*, 189 Or. App. 258, 264 (2003) . The intent to formalize the oral agreement in a later writing does not alter

the binding effect of the oral agreement. *Id.* (citing *Britt v. Thorsen*, 258 or. 135, 137 (1971)).

5. To enter into a binding settlement agreement on behalf of a client, an attorney, as an agent of their client, must have actual or apparent authority to enter into the settlement agreement. *Johnson v. Tesky*, 57 Or. App. 133, 136–68 (1982).

6. An agent's actual authority may be express or implied. "Express authority is that authority that the principal confers upon the agent in express terms. The express authority to do a certain thing carries with it the implied authority to do those other things that are reasonably necessary to carry out the authorized task." *Kaiser Found. Health Plan of the Nw. v. Doe*, 136 Or. App. 566, 573 n.3 (1995).

7. Apparent authority exists where a principal's conduct creates the appearance of authority, causing a third party to reasonably believe an agent has authority to take specific actions on behalf of the principal. *Harkness v. Platten*, 359 Or. 715, 721–23 (2016) (summarizing Oregon law governing apparent authority). "The principal's words, conduct, or other representation need not be made directly to or witnessed by the third party for the principal to be liable under a theory of apparent authority; rather, the representation of authority need only be traceable to the principal." *Id.* at 722. A grant of actual authority may lead a third party to believe the agent is authorized "to perform other, related tasks." A third party must actually rely on the principal's representation of authority. *Id.* at 723. Such reliance must be objectively reasonable, considering "what is customary and usual for certain positions or within certain professions." *Id.*

8. Retaining an attorney is not independently sufficient to create apparent authority to enter into a binding settlement agreement. *Johnson*, 57 Or. App. at 137–38. Authorizing negotiations with an opposing party also does not on its own create apparent authority to approve a settlement agreement.

*Id.* at 136–37. But authorizing an attorney to accept a settlement on specific terms can create apparent authority to accept settlement agreements on other terms. For example, where a party authorized her attorney to accept a settlement offer on specific terms, her grant of actual authority created apparent authority to accept a settlement offer including terms to which the party did not agree. *Kaiser*, 136 Or. App. at 573–74.

9. Lee gave Fjelstad actual authority to enter into a global walkaway settlement before the March 4 phone call between Fjelstad and Angeli. Lee and Fjelstad only discussed settling with both Sims and Trees. Accordingly, Fjelstad never had actual authority to agree to an individual settlement agreement with Sims.

10. By giving Fjelstad actual authority to settle the lawsuit on specific terms, Lee created apparent authority for Fjelstad to settle the lawsuit on terms to which Lee had not agreed.

11. Fjelstad implicitly represented that he had actual authority to enter into an individual settlement agreement with Sims only. He represented to Angeli that Lee would like to enter into a walkaway settlement with Sims, without conditioning the offer of settlement on Tree's willingness to settle.

12. Fjelstad's representation was traceable to Lee's conduct. *See Harkness*, 359 Or. at 722–23 ("a representation of authority need only be traceable to the principal"). Specifically, Fjelstad's implicit representation is directly traceable to Lee's authorization of a global settlement agreement. Although Fjelstad's implicit representation exceeded the scope of his actual authority, Lee reasonably should have realized that authorizing Fjelstad to enter into a specific settlement agreement would cause a third party to believe that Fjelstad had authority to accept other settlement offers. *See id.* at 722 (principal's conduct sufficient to create apparent authority if principal "should realize [the conduct] likely would cause a third party" to believe agent has authority) (quotation marks and citation

omitted); *Kaiser*, 136 Or. App. at 573–74 (authority to accept settlement offer without arbitration clause created apparent authority to accept offer with arbitration clause).

13. Angeli reasonably relied on Fjelstad's representation of his authority. Angeli had no way to know the limitations on the settlement authority Lee gave Fjelstad. Fjelstad mentioned the prospect of a settlement with Trees only after agreeing to a settlement agreement with Sims. Moreover, Sims' counterclaims gave Angeli cause to believe Lee would want to settle with Sims even if Lee and Trees could not agree on settlement terms. Fjelstad's role as an attorney and the parties' previous discussion of settlement only increase the objective reasonableness of Angeli's reliance on Fjelstad's representation.

14. Fjelstad had apparent authority to enter into an individual settlement agreement with Sims during and after the March 4 phone conversation.

15. Angeli had actual authority to form a walkaway settlement agreement with Lee on behalf of Sims.

16. Fjelstad and Angeli objectively manifested agreement to settle their clients respective claims on a walkaway basis. *See Dalton*, 209 Or. App. at 132. Both Angeli and Fjelstad indicated their agreement to the sole material term — mutual dismissal of Lee and Sims claims against one another. *See id.* They further agreed that Angeli would prepare the dismissal papers necessary to effectuate the agreement. Fjelstad and Angeli did not discuss any additional terms or condition their acceptance in any way. In sum, Fjelstad and Angeli's outward conduct indicated intent to be bound by the oral agreement alone. Angeli's commitment to memorialize the agreement in a document does not alter the binding nature of the oral agreement. Lee and Sims entered into a binding, enforceable settlement agreement through their attorneys on March 4, 2016.

14. There is no enforceable settlement agreement between Lee and Trees.

*Conclusion*

The court GRANTS Sims' motion to declare partial waiver of the attorney client privilege (ECF No. 82), with the limitations stated on the record at the evidentiary hearing. The court GRANTS Sims' motion to enforce the settlement agreement (ECF No. 65). Sims' alternative motion for partial summary judgment is DENIED as moot.

DATED this 16th day of June, 2017.

                                                /s John V. Acosta
                                                JOHN V. ACOSTA
                                         United States Magistrate Judge